# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| MARK M. MATLOCK AND SHAWNA R. MATLOCK, | ) ) ) | Case No. 05-50051 |
| Debtors. | ) ) ) | |
| BRUCE E. STRAUSS, Trustee, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Adversary No. 06-4002 |
| TERRY HOLLIS, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Under most circumstances, there is nothing unfair or suspect about a parent providing financial assistance to a child purchasing a home. And that appears to be all that the Defendant, Terry Hollis ("Hollis"), did in this case. He provided several loans to his daughter and her husband, Debtors Shawna and Mark Matlock ("Matlocks" or "Debtors"), to facilitate the purchase of a new home. To their credit, the Matlocks agreed to, and did in fact, repay these loans contemporaneously with or soon after they consummated the purchase of their new home. But shortly afterward, the Matlocks filed bankruptcy and, as they say in bankruptcy circles, "bankruptcy changes everything," particularly with regard to payments debtors make to their creditors within 90 days (or one year, in some cases) before the filing of the bankruptcy. Then, depending on the circumstances, even good faith, honest attempts to repay debts may be viewed – from the perspective of other creditors who were not repaid – as unfair "preferences" which can be avoided under the Bankruptcy Code. Unfortunately for Hollis, those circumstances are present here. The undisputed facts support a finding that the transfers totaling $29,612.60 the Debtors made to Hollis within one year of the date the Debtors filed bankruptcy are avoidable as preferences under 11 U.S.C. § 547, as alleged in Count I of the Trustee's Complaint in this case. Therefore, the Trustee's motion for summary judgment on Count I must be granted.

## STANDARD OF REVIEW

Summary judgment is appropriate when the matters presented to the Court "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[1] The party moving for summary judgment has the initial burden of proving that there is no genuine issue as to any material fact.[2] Once the moving party has met this initial burden of proof, the non-moving party must set forth specific facts sufficient to raise a genuine issue for trial and may not rest on its pleadings or mere assertions of disputed facts to defeat the motion.[3] The mere existence of a scintilla of evidence in support of the opposing party's position will not be sufficient to forestall summary judgment.[4] In ruling on a motion for summary judgment, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."[5]

## BACKGROUND

The essential facts are straightforward and essentially undisputed. Where the parties disagree is the interpretation of those facts, as is often the case.

Over a period of approximately three months, Hollis loaned the Debtors a total of $29,612.60 to facilitate the purchase of a residence ("Residence") at 3402 E. Devonshire Drive, in St. Joseph, Missouri. On July 27, 2004, Hollis loaned the Debtors $1,500 to put an "earnest money" deposit on the Residence. On August 6, 2004, Hollis loaned them $3,356.26 to pay off a debt secured by the Debtors' 1998 Dodge Intrepid, and on October 29, 2004, Hollis loaned the Debtors $13,000 to pay off a loan secured by the Debtors' 2001 Jeep Cherokee.[6] Apparently, UMB Bank agreed to lend

---

[1] Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

[2] *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 161, 90 S. Ct. 1598, 1611, 26 L. Ed. 2d 142 (1970).

[3] *Matsushita Electric Industrial Co., Ltd., v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (stating that the party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts").

[4] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 2512, 91 L.Ed. 2d 202 (1986).

[5] *Id.,* 477 U.S. at 255.

[6] The loan secured by the Jeep was owed to WFS Financial ("WFS").

Debtors the money to purchase the Residence on the condition that they pay off the loans secured by those vehicles. Finally, on October 29, 2004, Hollis loaned the Debtors $11,756.34 for the down payment on the Residence. None of these loans was memorialized in writing, and all of the loans were interest free and unsecured.

Hollis loaned the Debtors all of this money with the understanding that they would repay him with money they were expecting to get back from the sellers of the Residence for repairs that needed to be made on the Residence and from refinancing the Jeep after the closing. And aside from three smaller payments made on the August 6 loan ($356.24 on August 13, $250 on September 17, and $250 on October 18), the Debtors did precisely that. The Debtors closed on their purchase of the Residence on October 29, 2004, and received $15,000 back from the sellers. The Debtors used all of that money (plus some) to repay Hollis the money he had loaned them for the earnest-money deposit ($1,500), for the balance of the August 6 loan ($2,500),[7] and for the down payment ($11,756.34).[8] On November 26, 2004, the Debtors obtained a $13,000 loan from Getz Credit Union, secured by their Jeep, and used that money to repay Hollis the $13,000 he had loaned them to pay off the debt that had previously been secured by the Jeep. The Debtors contend (and the Court accepts as true for purposes of the Trustee's motion) that they would have repaid the $13,000 to Hollis sooner, but they couldn't refinance the Jeep until the previous lienholder provided them the title and a lien release.

The Debtors filed for chapter 7 bankruptcy on January 18, 2005. Thus, all of the payments to Hollis described above were made within a year of the filing date.

## DISCUSSION

Hollis does not dispute that the transfers totaling $29,612.60 made to him within one year of the bankruptcy petition date constitute preferential transfers under 11 U.S.C. § 547, and the Court

---

[7] The Debtors stated in their response that the balance of the August 6 loan as of October 29 was $2,560, but that is incorrect. Assuming the Debtors accurately stated the amount of the payments previously made on the August 6 loan, the balance as of October 29, which was presumably paid off by the Debtors with the funds they received from the sellers of the Residence, was $2,500.

[8] The Debtors admit that they paid Hollis all of this money, but the total amount paid to Hollis on October 29 exceeds the $15,000 the Debtors received from the sellers by $756.34. It is unclear, although ultimately irrelevant for purposes of the Court's decision, where the Debtors came up with this money.

3

does indeed find that they are preferential transfers. These transfers ("Transfers") were transfers of an interest of the debtors (the Matlocks) in property (cash), on account of antecedent debts, for the benefit of a creditor (Hollis), who is an insider (Debtor Shawna Matlock's father), made while the debtors were insolvent, made within a year of the bankruptcy petition,[9] and which enabled the creditor to receive more than he would have received if the transfers had not been made.[10] Hollis's defense to the Trustee's motion relies solely on certain statutory and judicially created exceptions to the avoidability of preferential transfers. However, the undisputed facts establish that none of those exceptions is applicable.

*Contemporaneous Exchange for New Value Defense*

First, Hollis contends that the October 29, 2004, $11,756.34 transfer cannot be avoided by the Trustee because it was a "contemporaneous exchange for new value" protected from avoidance under § 547(c)(1). But Hollis has not identified what "new value" he gave the Debtors in exchange for the transfer. He seems to suggest that the transaction qualifies as a contemporaneous exchange for new value simply because the loan and the repayment occurred on the same day. This suggestion, however, is without merit.

Section 547(c)(1) provides that a transfer which meets the elements of § 547(b) (which this transfer does) is not avoidable if the transfer was intended to be a contemporaneous exchange; was, in fact, a contemporaneous exchange; and the exchange was for new value given to the Debtor. New value, as the term is used in § 547(c)(1), "means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation."[11] Hollis, however, did not give the Debtors <u>anything</u> in exchange for the $11,756.34,

---

[9] The Trustee alleges that all of the transfers at issue were made within ninety days of the bankruptcy petition, but that is not true. The transfers made to Hollis on August 13, 2004 and September 17, 2004 were made over ninety days prior to the petition. However, because Hollis is an insider under the terms of § 101(31)(A)(I), those transfers are still preferences because they occurred within one year of the bankruptcy petition.

[10] 11 U.S.C. § 547(b) (setting forth the elements of a preferential transfer).

[11] 11 U.S.C. § 547(a)(1).

under this definition or otherwise. The $11,756.34 transfer to Hollis was a payment on an antecedent debt, and the fact that the debt was only recently antecedent, without more, does not shield it from avoidance by the Trustee.

*Ordinary Course of Business Defense*

Second, Hollis contends that the Transfers are not subject to avoidance because they were made in the ordinary course of business and such transfers are shielded from avoidance under § 547(c)(2). According to Hollis, the Debtors often borrowed money from him and paid him back as they had funds available, and these transfers, he argues, were no different. The Court disagrees.

Under § 547(c)(2), a preferential transfer is excepted from avoidance if the transfer was: "(1) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (2) made in the ordinary course of business or financial affairs of the debtor and the transferee; and (3) made according to ordinary business terms."[12] The transferee bears the burden of establishing the ordinary course defense by a preponderance of the evidence.[13]

In this case, the transferee – Hollis – has failed to establish that the transfers at issue meet any of the elements of § 547(c)(2). The debts were not incurred in the ordinary financial affairs of the debtor because these debts were significantly greater than any of the other debts to Hollis the Debtors had previously incurred, which ranged between $50 and $200. Moreover, the debts at issue here were incurred for the specific purpose of purchasing a house, and the Debtors have not produced any evidence to show that they were in the business or habit of purchasing houses, with or without Hollis's assistance.

The disparity in purpose and amounts between the previous debts and those at issue here also precludes the repayment of those debts from qualifying as transfers made in the ordinary course of financial affairs of the Debtors and Hollis.[14]

---

[12] 11 U.S.C. § 547(c)(2).

[13] *Jones v. United Sav. & Loan Ass'n* (*In re USA Inns of Eureka Springs*), 9 F.3d 680, 682 (8th Cir. 1993) (citations omitted).

[14] *See In re McElroy*, 228 B.R. 791, 795 (Bankr. M.D. Fla. 1999) (disparity in payment amounts precludes finding that transfers are made in the ordinary course); *In re Vunovich*, 74 B.R. 629, 631 (Bankr. D. Kan. 1987) (same).

Finally, the Transfers were not made according to "ordinary business terms." To establish the "ordinary business terms" prong of § 547(c)(2), a defendant must show that the terms of a transfer were consistent with the practices and standards of an industry. Because the Transfers occurred between family members, the Court concedes that demonstrating the objective ordinariness might be more difficult. However, Hollis has offered absolutely no evidence on this issue, so the Court can summarily conclude that he has not satisfied his burden of showing that the Transfers were made according to ordinary business terms. Furthermore, it is unlikely that such a showing would have been possible in light of the fact that the loans Hollis made to the Debtors were interest free and were to be repaid upon the occurrence of "extraordinary" events, *i.e.*, the purchase of real estate where significant funds were due back from the sellers and the encumbering of a vehicle where the vehicle had only become un-encumbered through the application of the proceeds from the loan being repaid.

*Earmarking Defense*

Third, Hollis contends that the Trustee cannot avoid the November 26, 2004, $13,000 transfer because the "earmarking" defense applies. The earmarking defense is a judicially created exception to § 547 which derives from the statutory requirement that a transfer, in order to be deemed preferential, must be "of an interest of the debtor in property."[15] Generally, it involves a new creditor swapping places with an existing creditor by paying off the existing creditor with funds "earmarked" for the payoff of a certain debt. Three elements must be present for the doctrine to apply: (1) the existence of an agreement between a lender and a debtor that new funds will be used to pay a specific antecedent debt, (2) the agreement is performed according to its terms, and (3) the transaction viewed as a whole does not result in any diminution of the estate.[16]

Hollis argues that the doctrine applies here because: 1) he had an agreement with the Debtors that he would lend them money to pay off the loan secured by their Jeep and they would pay him back with money they would get from refinancing the Jeep after they closed on the purchase of the Residence; 2) the agreement was performed according to its terms, except for a slight delay in

---

[15] *In re Libby International, Inc.*, 240 B.R. 375, 377 (Bankr. W.D. Mo. 1999).

[16] *Id.*

6

refinancing the Jeep because of title issues; and 3) the transaction viewed as a whole did not diminish the estate because before and after the transaction the debtors owed a $13,000 debt secured by their Jeep.

Essentially, Hollis wants to collapse the October 29 and November 24 transactions so that the only facts considered are that the Jeep was secured by a $13,000 debt then and secured by a $13,000 debt now. But that characterization of the transaction ignores the fact that the Jeep was unsecured between those dates and that Hollis was paid in full on an unsecured debt, whereas other unsecured creditors were not paid at all. Moreover, the Court is simply not willing to extend *Heitkamp*'s instruction to view a transaction "as a whole" to encompass transactions occurring nearly a month before the transfer sought to be protected by the earmarking doctrine occurs. So the fact that the Debtors used the $13,000 Hollis loaned them on October 29, 2004, to pay off the loan secured by the Debtors' Jeep is irrelevant to the analysis of the Debtors' transfer of $13,000 to Hollis on November 24, 2004. When Hollis loaned the Debtors $13,000 on October 29, he became an unsecured creditor, plain and simple. Hollis's knowledge of the use of the loan proceeds and the source of funds to repay him did not change his status as an unsecured creditor.[17]

Since Hollis was an unsecured creditor, the November 24 transfer diminished the estate by $13,000 because the Debtors obtained those funds by granting Getz Credit Union a security interest in their recently unencumbered Jeep. The law on this point is clear: the earmarking doctrine does not apply when a security interest is given for funds to pay an unsecured debt.[18] Before the $13,000 transfer to Hollis, the Debtors had an unencumbered vehicle and a $13,000 interest-free, unsecured debt to Hollis. After the transfer, the Debtors' Jeep was encumbered by a $13,000 interest-bearing, secured debt to Getz Credit Union.

*Award of Prejudgment Interest*

The Bankruptcy Code does not contain a provision controlling the award of prejudgment interest. Therefore, federal common law determines whether to apply prejudgment interest to any

---

[17] The only application the earmarking doctrine might have to the October 29 transaction would be if the Trustee sued WFS (the former lender with a security interest in the Jeep). In that situation, Hollis would be the new lender and WFS would be the old lender.

[18] *Kaler v Community First Nat'l Bank* (*In re Heitkamp*), 137 F.3d 1087, 1089 (8th Cir. 1998).

award under a federal statute.[19]  Under federal common law, the prevailing party is entitled to interest on his recovery, from the date of demand, where the amount of the recovery is liquidated and ascertainable.[20]  "In bankruptcy proceedings, the courts have traditionally awarded prejudgment interest to a trustee who successfully avoids a preferential or fraudulent transfer from the time demand is made or an adversary proceeding is instituted unless the amount of the contested payment was undetermined prior to the bankruptcy court's judgment."[21]  With regard to prejudgment interest on a preference claim, Collier states, "Prejudgment interest on a preferential transfer is recoverable from the date the transfer was demanded, unless there is a sound reason otherwise."[22]

The amount of the Transfers was easily ascertainable from the time the Trustee first made demand on the Defendant.  And the Defendant has not given the Court any cognizable[23] reason why prejudgment interest should not be awarded.  Therefore, the Court will award the Trustee prejudgment interest on $$29,612.60 from January 5, 2006, to the date of collection, at the rate set forth in 28 U.S.C. § 1961, which is currently 5.06%.

## CONCLUSION

For the reasons set forth above, the Court finds that the $$29,612.60 transferred by the Debtors to the Defendant, Terry Hollis, within one year of the date the Debtors filed bankruptcy is avoidable as a preference under 11 U.S.C. § 547.  Accordingly, the Court will grant summary judgment in favor of the Trustee on Count I of the Trustee's complaint and enter a judgment against Terry Hollis in the amount of $$29,612.60 , with interest accruing as of the date of

---

[19] *In re Broadview Lumber Co., Inc.*, 168 B.R. 941, 965 (Bankr. W.D. Mo. 1994).

[20] *Kaufman v. Tredway*, 195 U.S. 271, 273, 25 S.Ct. 33, 34, 49 L.Ed. 190 (1904); *see also Robinson v. Watts Detective Agency, Inc*. 685 F.2d 729, 741 (1st Cir. 1982).

[21] *In re Broadview Lumber, Inc.*, 168 B.R. at 965.

[22] 5 Collier on Bankruptcy ¶ 547.15, p. 547-132 (15th Ed. rev. 2006).

[23] Hollis suggests that an award of pre-judgment interest would be inappropriate here because the Trustee did not engage in meaningful settlement discussions.  Settlement negotiations, or the lack thereof, are not relevant to the Court's determination of whether to award prejudgment interest, especially without evidence that the Trustee used the settlement negotiations to unduly delay the adjudication of this matter.

demand, January 5, 2006, at the rate set forth in 28 U.S.C. § 1961. A separate order consistent with this Memorandum Opinion shall be entered pursuant to Fed. R. Bankr. P. 9021.

    **ENTERED** this 22nd day of February 2007.

                                               /s/    Jerry W. Venters
                                             United States Bankruptcy Judge

Copy of the foregoing mailed electronically or
conventionally to:
Bruce E. Strauss
Erlene W. Krigel